# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: August 12, 2020

Mr. Ronald W. Chapman Sr.
Chapman Law Group
1441 W. Long Lake Road
Suite 310
Troy, MI 48098

Mr. Kevin J. O'Dowd
Office of the Attorney General
of Michigan
P.O. Box 30217
Lansing, MI 48909

Mr. Matthew Gregory Swartz
Nolan & Shafer
40 Concord Avenue
Muskegon, MI 49442

> Re: Case No. 20-1035, *Judith Barrett v. Patricia Carter, et al*
> Originating Case No. : 2:18-cv-11121

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc: Mr. David J. Weaver

Enclosure

Mandate to issue

**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0476n.06

Case No. 20-1035

### UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JUDITH BARRETT, | ) | **FILED** |
| | ) | Aug 12, 2020 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| PATRICIA CARTER, et al., | ) | |
| | ) | **OPINION** |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: NORRIS, NALBANDIAN, and READLER, Circuit Judges.

NALBANDIAN, Circuit Judge. Jeffrey Barrett was an inmate in the Michigan prison system. During his imprisonment, he saw multiple medical professionals and received treatment for different ailments. He was ultimately paroled. But shortly after the parole, Barrett was diagnosed with lung cancer that had, at the point of identification, already metastasized. He passed away a little over a month after his parole.

His wife (Judith Barrett) sued. She named as defendants, in their individual capacities, the nurses and physician assistants who provided Barrett treatment before his parole. In one count, she sought damages and attorney's fees under 42 U.S.C. §§ 1983 and 1988 for Defendants' alleged violations of Barrett's Eighth and Fourteenth Amendment rights. Defendants successfully moved for summary judgment. Plaintiff appeals. Viewing the facts in the light most favorable to Plaintiff,

we find the record devoid of any evidence that tends to show Defendants were deliberately indifferent. Because Plaintiff cannot prevail, we AFFIRM.

I.

On appeal from a grant of summary judgment, we take the facts of the case in the light most favorable to the nonmovant. Before discussing the facts relevant to Barrett and this case, we give a brief background on the inner workings of medical treatment at the facility where Barrett served his sentence—the Michigan Department of Corrections (MDOC) and Gus Harrison Correctional Facility (GHC). GHC inmates could, while Barrett was an inmate there, request healthcare using a "kite box" located in the yard and on the individual units. (R. 42-7, Ex. Carter Dep., PageID 1017.) Inmates fill out a form or provide written communication on other pieces of paper "if there's no[] [form] available." (*Id.*) When the nurse comes in at night—in this case, Defendant Patricia Carter, RN—she "pick[s] up those kites and [] spend[s] the night answering them." (*Id.*) In response to the kites, Carter either "set[s] up an appointment for the[] [inmates]" or, for some that require immediate attention, she "ha[s] to call out and talk to [them] . . . [to] see if they were safe or if they had to be put in seg. or something." (*Id.* at 1018–21 (explaining that "[i]f an inmate has an urgent problem . . . [she] will speak to the prisoner" and that she "pretty much saw anybody who requested to be seen at night" but "if [she] didn't see them, [she] would put a note in the record documenting . . . the reason why [she] felt she didn't have to see th[em]").)

For every kite she received, she would generate a report but "d[id] not make diagnoses" because "[n]urses don't diagnose." (*Id.* at 1020; *see also* R. 33-3, Ex., PageID 540 (explaining that "Michigan law . . . does not allow the nurse to diagnose and treat medical conditions" and they instead provide "nonmedical care to relieve symptoms of patients' injuries, disease, and conditions" as well as refer patients when conditions "require[] a higher level of care").) In

response to every kite received, the computer system would automatically schedule a visit ("[a]lmost always with the nurse") and schedulers would set up the actual schedule the next morning by "fit[ing] [the visit] into the slot that they have." (R. 42-7, Ex. Carter Dep., PageID 1021.)

For complaints about an urgent medical problem, *e.g.*, a heart attack, stroke, or blood "gushing out from an artery" at that moment, inmates would receive medical attention from "medical provider[s]" or "M.P.[s]" (physician assistants or "P.A.[s,]" "M.D.[s,]" or "D.O.[s]"). (*Id.* at 1022.) But for all other situations, inmates usually saw nurses three times before the nurses could refer inmates to an M.P. (*Id.* (explaining that the staff did this "according to the policy books" and that the nurses "were [generally] not allowed to make direct appointments through the computer with the M.P.'s unless it was th[e] [inmates'] third visit").) After the third visit, even if the nurses "didn't find anything that the M.P. really need[ed] to see the[] [inmates] about, the[] [inmates] would [] still get an appointment [with the M.P.] anyway[.]" (*Id.* at 1022–23.)

Back to Barrett specifically.[1] Starting June 11, 2014, Barrett was an inmate at GHC. Upon intake into MDOC, Barrett was screened and "reported a history of stomach ulcer[,]" a "herniated lumbar disc[,] and DDD (degenerative disc disease) for 25 years." (R. 33, MDOC Summ. J. Mot., PageID 258.) Barrett's DDD resulted in pain in his lower back, something he received treatment for during his time at MDOC. The relevant period of medical complaints and treatment (according to Plaintiff) began in early April 2015 and ended upon Barrett's parole in mid-August of that year.

---

[1] To recount Barrett's extensive medical history at GHC during the relevant period of time, we rely on the medical records detailing Barrett's treatment during his incarceration. Though Plaintiff leaves out some of the events found in those records, she references those records throughout her briefs (below and in her appellate brief) and does not dispute their accuracy. She also attached those records, including those with information omitted from her retelling of the facts, to her response in opposition to Defendants' summary judgment motions below. And Defendants did as well. So we adopt those records as the undisputed facts.

Barrett complained for the first time on April 9, 2015 that it hurt to breathe on his right side and that he had experienced that pain for the past two weeks. Carter scheduled a nursing appointment for the next day because she determined that the complaint "[wa]s not . . . an emergen[cy] situation" given Barrett waited two weeks before complaining about it. (R. 42-7, Ex. Carter Dep., PageID 1025.) After that and until he was paroled on August 18, 2015, Barrett saw either the nurses at MDOC or an M.P. over fifteen times as well as transmitted and received multiple messages about his healthcare. Given the volume and importance of that information to this appeal, we provide them below.

- Defendant Rosanne M. Jones, RN (now-deceased) saw Barrett for his scheduled appointment on April 10 (a Friday) and ordered over-the-counter (OTC) pain medication to ease Barrett's pain.

- Barrett then saw Defendant John Solomonson, RN the Monday after the visit with Jones and again reported similar symptoms. Solomonson examined Barrett and recorded that he found both lungs "[c]lear to auscultation" without "[r]ales[,]" "[c]rackles[,]" and "[w]heezes[.]" (R. 42-1, Ex. Medical Records, PageID 917.)

- Barrett saw Christopher C. Nethercott, RN the next day for a scheduled follow-up visit where Barrett complained that while he saw nursing three times, "nothing has worked[.]" (*Id.* at 915.) Nethercott informed Barrett that he would see an M.P. but, after Nethercott informed Barrett that it would be a P.A., Barrett became angry and abruptly left.

- Two days after seeing Nethercott, on April 16, 2015, Barrett saw Defendant Savithri Kakani, P.A. for his cough and pain in the right side of his chest. Although she found Barrett's overall health (including his lungs) normal, based on Barrett's complaints, Kakani ordered that they monitor his vital signs three times per week for a month. She also ordered a chest X-ray to take place the next day and recorded the reason: "cough smoker[.]" (*Id.* at 909.) And Barrett let Kakani know that he did not take any pain medication given his history with drug abuse so Kakani discontinued the previously-ordered pain medication.[2]

---

[2] That night, Barrett sent a kite reporting again his pain while breathing and explaining that he suspected he had pneumonia. In response, Carter explained that Barrett already received medical attention from nurses and Kakani and that the ordered X-ray would confirm "any presence of pneumonia." (R. 42-1, Ex., Medical Records, PageID 907.)

Ten days later on April 26, Barrett sent a "Health Care Request" to prison staff reporting the same pain in his right side. (*Id.* at 921.) This time he reported it hurt "all the way through to

- The X-ray went through as scheduled on April 28 and Lyle S. Mindlin, D.O. reported that it showed Barrett's "lung fields a[s] free of acute disease process[,]" an "unremarkable" "cardiac silhouette[,]" and "[c]hronic obstructive pulmonary disease" (COPD) or "[c]hronic lung disease."[3] (*Id.* at 901; R. 33-3, Ex., PageID 534.)

- On April 29, Defendant Brenda Eaton, RN saw Barrett where he complained of the same pain as before, that it felt better when he lay on his left side, and that he "cough[ed] up yellow-brown sputum" the week before the visit.[4] (R. 42-1, Ex. Medical Records, PageID 898–99.) Eaton noted Barrett denied any blunt trauma but found "diminished lung sounds through-out[.]" (*Id.*) She then made an appointment to follow up on the X-ray results with Kakani for May 1, 2015.

- Solomonson saw Barrett next after Barrett reported the same pain he'd previously reported and found Barrett's "[l]ungs sound[ed] clear but slightly diminished in lower lobes bilaterally."[5] (*Id.* at 895 (May 2).) He discussed the X-ray results with Barrett, provided Barrett educational material on COPD, and ordered no further treatment at that time.

- Four days later, "per PA order[,]" Barrett received "4 days of medication . . . with instruction."[6] (*Id.* at 889.)

---

back sho[u]lder blade . . . at all times" and asked for help. (*Id.*) Defendants' discussion of the factual background does not include this health care request or the response. But Plaintiff includes as an exhibit a copy of Barrett's handwritten request on that date. It's also unclear from the record the difference between such a request and a kite. And between April 16 and 28, the nurses took Barrett's vitals as ordered by Kakani on the 20th, the 22nd, and the 27th of that month.

[3] For reasons not explained in the record, the X-ray was at first canceled and then rescheduled for April 28, 2015.

[4] In the early morning of April 28, Barrett kited and complained again about the same pain on his right side while breathing. But given his pending X-ray on that day, Carter scheduled this nurse visit for the day after.

[5] Before this, Defendant Kimberly C. McGuire, RN took Barrett's vitals on May 1, 2015 as previously ordered by Kakani. Dawn Maly, LPN then did the same three days after that on May 4. Four days after that, on May 8, Eaton recorded taking Barrett's lab specimen for Barrett's hypertension and taking his vitals. And for the rest of May: Kimberly A. Korte, RN took Barrett's vitals on May 11, Jones on May 13, and McGuire again on May 15.

[6] Two days after that, Barrett submitted another "Health Care Request" again reporting his chest pains (alleging this time that he had pain "all the way through to sho[u]lder blade") and that it hurt to both breathe and walk at this point. (R. 42-1, Ex., Medical Records, PageID 922.) Defendants' discussion of the facts does not explicitly include this request. But Plaintiff includes as an exhibit a copy of Barrett's handwritten request on that date.

5

- On May 11, Barrett submitted another kite complaining of the same pain he'd previously reported. So Carter scheduled a callout, and Jones saw Barrett the next day. During the visit, Barrett reported that he found the only medications he had been taking (OTC medications) "not effective" and still had the same pain on his right side but that he had "[n]o cough[.]" (*Id.* at 880 (explaining that Barrett was "guarding area above R nipple").) Jones then ordered another visit with Kakani for May 13.

- At his visit with Kakani, Barrett explained that "moderate activity" "aggravated" his symptoms such as his "dry cough."[7] (*Id.* at 871.) Kakani examined him and recorded that Barrett's exam returned normal results but recorded that his COPD was "[p]oor." (*Id.* at 872.) She then prescribed to him Qvar (an "oral inhaler") as well as Proventil HFA or "albuterol" (an "actuation aerosol inhaler"). (*Id.*) She also placed Barrett in the pulmonary chronic care clinic, instructed him to increase his fluid intake and follow an exercise program, and gave him "education" on his condition and medication. (*Id.* at 871–73.)

- Kakani then saw Barrett again on May 21 for his chronic care visit where she conducted a physical examination and found nothing out of the ordinary. She also discussed with Barrett management or treatment options with another provider, reviewed diagnostic study tests with him, and provided him with education on relevant topics. And she ordered that he avoid "ASA" and "NSAIDS" as well as increase his fluid intake, increase his activity level, and follow an exercise program. (*Id.* at 868–69.)

- Kakani had the same discussion with Barrett again on his June 15 chronic care visit.[8] His physical exam again revealed nothing out of the ordinary. And Barrett let Kakani know that he "[wa]s taking otc meds [at that time] and [was] doing good" and that his "shoulder and muscles . . . feel better" "when he walks and rest[s.]" (*Id.* at 863.) But Barrett again complained that moderate activity aggravated his symptoms and that the "inhal[e]rs don[']t help much[.]" (*Id.*)

- On June 28, Eaton scheduled a nurse appointment for June 30 in response to Barrett's kite complaining that it "[h]urt[] to breathe" and that he had very bad pain (a "10+" on a scale

---

[7] The night before his visit with Kakani, Barrett again submitted a kite to Carter complaining about the same pain to which Carter responded: "? Why kiting. You have a visit pending already." (R. 42-1, Ex., Medical Records, PageID 877.)

[8] Before this visit, Barrett requested a refill of his albuterol inhaler on June 10. The day after this visit, he submitted another kite to Carter very early in the morning on June 16. In it, he complained that his chest pain had worsened, that he had COPD, and that he saw no improvement in his back and shoulder pain. He explained that the "meds from store do not help[.]" (R. 42-1, Ex. Medical Records, PageID at 862, 924.) Carter responded that Barrett had dated the kite on June 14 and that, because Barrett saw Kakani on June 15, Carter "assumed [Barrett] discussed th[e] issue[s] [in the kite] with [Kakani] at that time." (*Id.*)

Case 2:18-cv-11210-SJM-EAS ECF No. 55, PageID.1251 Filed 08/12/20 Page 7 of 19
Case: 20-1035 Document: 27-2 Filed: 10/26/2020 Page: 8 (8 of 19)

No. 20-1035, *Barrett v. Carter*

of 10) in his "shoulder/back/R[ight] arm[.]"[9] (*Id.* at 861.) At that appointment, Barrett complained to McGuire that despite Kakani letting him know he had COPD, he "d[id]n't think so." (*Id.* at 859.) He also let McGuire know that he "ha[d] an appointment with [his] doc the day [he] get[s] out to see what is real and what is not." (*Id.*) And he let McGuire know that he "just want[ed] th[e] RN to make a note in the computer that his arm is sore and numb." (*Id.*) McGuire also recorded the visit as one related to a "strain/sprain." (*Id.* at 860.)

- On July 9, Barrett saw Defendant Kimberly A. Korte, RN who recorded tenderness and pain with movement in Barrett's shoulder as related to a "strain/sprain."[10] (*Id.* at 856.) She ordered he take ibuprofen, use "[i]ce/cool compresses[,]" and go to "[s]ick call if symptoms do not subside or become more severe." (*Id.* at 857.)

- The day after that, Barrett had his annual health screening with Solomonson. During that meeting, Barrett "denie[d] emergent/urgent medical needs[,]" denied any fever, chills, night sweats, cough, "bloody or black stools[,]" and "recurrent abdominal pain[,]" and exhibited no distress. (*Id.* at 853.) But Barrett reported "recurrent chest pain" and "difficulty breathing"—something Solomonson attributed to the COPD diagnosis. (*Id.*)

- Kakani then saw Barrett on July 20 for another chronic care visit where Barrett's physical exam yielded no abnormalities and during which she recorded his COPD as "[g]ood." (*Id.* at 848.) They again discussed the same topics and concerns that they had discussed during the earlier chronic care visits.

- Defendant Sarah E. Miller, RN then saw Barrett the next day for an unscheduled visit. During that visit, Barrett let Miller know that he could not breathe while walking, "feels better laying down," and had pain in his right-side chest and "right shoulder/armpit[.]" (*Id.* at 845.) She recorded that she found Barrett's lungs clear and that Kakani called and ordered that he see an M.D. Barrett returned to his unit in a wheelchair, and Miller instructed him to rest for the remainder of the day or night as well as to "kite if symptoms get worse." (*Id.* at 843.)

---

[9] Before this visit on June 23, Barrett submitted a grievance to MDOC in which he complained that he received no medical treatment despite his repeated complaints and complained again about his ailments. In response, Defendant Janet Campbell, RN interviewed Barrett and Defendant Lori Kopka, RN reviewed the grievance as well. Campbell and Kopka then denied the grievance because they noted Barrett "[wa]s being evaluated [and] treated" and that his M.P. had conducted and monitored his "diagnostic treating[.]" (R. 42, Resp., PageID 804 (noting that although Barrett could disagree with his M.P.'s "medical judgment[,]" that did not amount to or support a claim that the treatment plan is inappropriate).) And they encouraged Barrett to access health care through the procedures in place at the facility.

[10] Two days earlier, in response to Barrett's kite, Carter refilled both inhalers and scheduled a callout for shoulder pain of which Barrett complained.

- The day after that, Barrett had another unscheduled nurse visit with Eaton who ordered Barrett receive his meals in his unit for the next week and sent Barrett back to his "unit via wheelchair" after Barrett complained he could "only breathe good lying down." (*Id.* at 839.)

- In response to Barrett's "continue[d] . . . breathing problems when walking long distances[,]" on July 30, Korte continued Barrett's "meal-in detail" and scheduled Barrett for another visit with an M.P.[11] (*Id.* at 836.)

- Two days later on August 1, Barrett saw Gregory Boyd, RN for an unscheduled nurse visit where Barrett complained of pain "related to his COPD" in his right shoulder. (*Id.* at 832.) Boyd found Barrett's lungs "clear throughout with shallow breathing" and ordered Barrett pain medication and a "2 week lay[]in with meals in [] per [Barrett's] request." (*Id.* at 830, 833.)

- Two days after seeing Boyd, Barrett requested to see a doctor, not a P.A., and complained of COPD, back pain while out of bed, and pain in his right shoulder. But Barrett failed to show up to the scheduled appointment.

- Barrett did show up to his scheduled visit on August 5 despite denying any need for treatment. He again complained of his COPD as well as back and shoulder pain so Boyd gave Barrett Tylenol for three days and noted that Barrett "ha[d] a lay in with meals in until he paroles." (*Id.* at 822.)

- On August 10, the physician was notified of Barrett's impending release. A week after that, Barrett "[was] seen in healthcare for scheduled exit interview" and paroled the next day on August 18, 2015. (*Id.* at 820.)

The same day he was paroled, Barrett went to Spectrum Health Gerber Memorial where they took X-rays of his chest and found a mass in his right lung "consistent with a [] tumor." (R. 42-4, Ex., PageID 934.) They then diagnosed him with "Stage IV adenocarcinoma" that "had

---

[11] Before this, Barrett sent two kites on July 28 and 29. In the first one, he requested a refill for his inhalers. Becky Seymoure let Barrett know that they could not refill them until a later date and to send another kite "[i]f he [was] having issues and would like to be seen[.]" (R. 42-1, Ex. Medical Records, PageID 838.) In the second kite, he explained he "[s]till need[ed] meals in" given he "still c[ould ]not walk 200 feet without falling" and had "extreme pain in shoulder and arm." (*Id.* at 837.) Carter responded that Barrett had seen an M.P. July 20, was referred back to an M.P. after his nursing visits on July 21 and 22, and scheduled another visit with an M.P.

8

metathesized" by the time doctors identified the tumor. (R. 42, Resp., PageID 810.) Barrett passed away on September 24, 2015, a little over a month after he was paroled.

Plaintiff sued. She named as defendants Campbell, Carter, Eaton, Jones (now-deceased), Kopka, Korte, McGuire, Miller, and Solomonson in their individual capacities (MDOC Defendants). She also sued Kakani.[12] She brought one § 1983 claim alleging Defendants violated Barrett's Eighth and Fourteenth Amendment rights. And she sought damages as well as attorney's fees for her claim.

During discovery, Plaintiff took only two depositions—one of Miller and the other of Carter—and provided no expert evidence. Defendants, on the other hand, put forth affidavits or statements by Kakani and three experts: Neel Shah, M.D., an oncologist who specializes in lung cancer, Claudia Barrett, a physician assistant who has worked in correctional and primary care for over eight years, and Kathryn J. Wild, a licensed RN who has worked in the field of corrections healthcare for over 30 years.

Dr. Shah explained that Barrett "had a clear chest X-ray on April 28th, 2015 that did not reveal any mass" and so "his malignancy must have developed between that date and August 18th, 2015" (the day he was paroled). (R. 37-6, Shah Letter, PageID 593.) She also explained that Barrett's "outcome would not have been different if the disease was found a few months earlier." (Id. (describing Barrett's disease as "very aggressive").) And the medical care and treatment Kakani provided "[wa]s consistent with the standard of care"; "[w]hen a patient with COPD

---

[12] Likely because Kakani is only a "contract correctional medical provider[]" rather than an employee at MDOC and because of the different role Kakani served from the MDOC employees, different attorneys represented Kakani and the MDOC Defendants below. (R. 49, Reply, PageID 1566.) We also note that although MDOC did not employ Kakani, this court has found "§ 1983 liability applies to [medical providers] who are not formally employed by a state, but who instead serve prison populations as government contractors." *Johnson v. Karnes*, 398 F.3d 868, 876 (6th Cir. 2005).

9

presents with shortness of breath, getting a [chest X-ray] and following up with the patient to review results is appropriate" and the records revealed "his symptoms were addressed in the appropriate manner[.]" (*Id.* at 593–94.)

The physician assistant opined that "it is [her] professional opinion that" the medical care Kakani provided reflected "no deliberate indifference or negligence[.]" (R. 37-7, Barrett Aff., PageID 599.) But, she speculated, Barrett's "clinical outcome may have been attributed to several factors, including his age, social history of smoking[,] and the possible incorrect reading of the chest X-ray which guided most of his care." (*Id.*)

Wild also walked through a comprehensive discussion of the treatment Barrett received while at GHC. Based on that information, she opined that the MDOC Defendants used "reasonable and acceptable practices" when treating Barrett and "were not negligent nor did they consciously disregard any serious health care need." (R. 33-3, Ex., PageID 539.) She found "no barriers to accessing healthcare in the" MDOC and that the MDOC Defendants "appropriately responded to" Barrett's "requests for care and ensured that he was referred to a higher level of care when required[,]" in compliance with Michigan law. (*Id.* at 540–42 (explaining that Michigan law does not permit RNs to diagnose and only to provide other care as well as refer patients for a higher level of care).) Thus, given Wild's understanding, the MDOC Defendants "unequivocally did not intentionally or recklessly fail to act with reasonable and appropriate care." (*Id.* at 542.)

Defendants then moved for summary judgment. The MDOC Defendants requested the district court dismiss Plaintiff's Fourteenth Amendment claim and argued that they were entitled to qualified immunity on Plaintiff's Eighth Amendment claim. Kakani, on the other hand, did not invoke qualified immunity. She instead argued that discovery revealed no material issue of fact

10

warranting the case go to a jury and urged the court to find that her actions did not amount to one that could support an Eighth Amendment claim.

The district court granted Defendants' summary judgment motions. It agreed that Plaintiff could not proceed on an independent Fourteenth Amendment claim. It then laid out the two components (objective and subjective) an inmate must show to make out an Eighth Amendment claim—a sufficiently serious medical need and deliberate indifference to that medical condition. Based on that test, it found the MDOC Defendants were entitled to qualified immunity because Plaintiff "failed to present any evidence that MDOC Defendants were aware of [Barrett]'s cancer, or that they failed to provide him treatment." (R. 51, Op. & Order, PageID 1609.) And the district court further explained that "[t]he evidence shows that [] Kakani believed [Barrett] had COPD and treated him for the same" and that "[t]here is no evidence that [] Kakani thought [Barrett] may have had lung cancer." (*Id.* at 1612.) Plaintiff appeals.

## II.

On appeal, Plaintiff urges us to reverse the district court's decision and find there is a genuine issue of material fact on whether the MDOC Defendants are entitled to qualified immunity and whether Defendants were deliberately indifferent to Barrett's serious medical needs. Her argument consists almost entirely of summaries of three Sixth Circuit cases that she argues demonstrate a genuine issue of material fact in this case.

Defendants disagree. They ask this court to affirm the district court's judgment. The MDOC Defendants do not take the position that Plaintiff failed to meet the analysis's objective component, only that she failed to provide any evidence that shows they were deliberately indifferent to Barrett's medical needs. Kakani argues Plaintiff failed to meet both components of the analysis.

11

No. 20-1035, *Barrett v. Carter*

### A.

Here the district court granted summary judgment in the MDOC Defendants' favor because it found those defendants are entitled to qualified immunity. We review de novo a district court's grant of summary judgment on qualified immunity grounds and draw all inferences and view all the evidence in a light most favorable to the nonmoving party. *Gilmore v. Hodges*, 738 F.3d 266, 272 (6th Cir. 2013). We examine whether there exists a genuine dispute of material fact that precludes summary judgment or whether no such dispute exists so that the movant is entitled to judgment as a matter of law. *Rhinehart v. Scutt*, 894 F.3d 721, 735 (6th Cir. 2018).

Qualified immunity shields government officials from civil damages liability in a § 1983 suit like the one here unless they violated a statutory or constitutional right clearly established at the time of their alleged violation. *Gilmore*, 738 F.3d at 272. "Once a defendant raises qualified immunity, 'the burden is on the plaintiff to demonstrate that the official is not entitled to qualified immunity[.]'" *Simmonds v. Genesee County*, 682 F.3d 438, 444 (6th Cir. 2012) (original alteration omitted) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). To do so, the "plaintiff 'must present evidence sufficient to create a genuine issue as to whether the defendant committed the acts that violated the law'" and must "allege[] 'facts sufficient to indicate that the [defendant's] act in question violated clearly established law at the time the act was committed[.]'" *Id.* (quoting *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992)); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We may resolve whether a plaintiff has met those requirements in any order. *Pearson*, 555 U.S. at 236.

12

Plaintiff's claims on appeal depend on whether there exists a genuine issue of material fact on her Eighth Amendment claims.[13] The Eighth Amendment prohibits the "inflict[ion]" of "cruel and unusual punishments[.]" U.S. Const. amend. VIII. Despite the "paucity of evidence from the Founding era . . . about how the Eighth Amendment was commonly understood to operate in the prison context[,]" the Supreme Court has recognized the amendment "applie[s] to some deprivations . . . not specifically part of the sentence but [] suffered during imprisonment." *Rhinehart*, 894 F.3d at 735–36 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). For example, the Supreme Court in *Farmer v. Brennan* explained that the amendment imposes on prison officials the duty to "ensure that inmates receive adequate . . . medical care[.]" 511 U.S. 825, 832 (1994).

Two components (objective and subjective) now make up modern Eighth Amendment doctrine. First, the objective. Under that component, "the deprivation [of medical care] alleged must be, objectively 'sufficiently serious,' [and] a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities[.]'" *Id.* at 834 (citation omitted) (quoting *Wilson*, 501 U.S. at 298; *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

The subjective component requires that a plaintiff must "at a minimum[] allege 'deliberate indifference' to [the inmate's] 'serious' medical needs[.]" *Rhinehart*, 894 F.3d at 736 (quoting *Wilson*, 501 U.S. at 297). While that does not require a plaintiff to allege that the officers acted "for the very purpose of causing harm or with knowledge that harm will result[,]" it requires a showing of criminal recklessness. *Farmer*, 511 U.S. at 835–40. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

---

[13] The district court dismissed Plaintiff's Fourteenth Amendment claim below, and she makes no effort to argue that Defendants violated Barrett's Fourteenth Amendment rights on appeal. To the extent she made a standalone Fourteenth Amendment claim below, we need not review the district court's decision on those grounds. *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 318 (6th Cir. 2005).

13

No. 20-1035, *Barrett v. Carter*

he must also draw the inference." *Id.* at 837–39 (describing this mindset as "'consciously disregard[ing]' a substantial risk of serious harm" (original alterations omitted) (quoting Model Penal Code § 2.02(2)(c))); *see also Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012); *Miller v. Calhoun County*, 408 F.3d 803, 821 (6th Cir. 2005) (finding no genuine dispute on whether the defendant was deliberately indifferent although she "had knowledge of the circumstances surrounding [the inmate]'s deteriorating condition" because nothing in the record would allow a jury to find the defendant "drew [] [the] inference" of "a substantial risk of serious harm"). And "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment" and an Eighth Amendment violation. *Farmer*, 511 U.S. 838; *see also id.* at 843 n.8.

To the extent a plaintiff complains "solely [about] the lack of diagnosis and inadequate treatment of" the injury or ailment and takes the position "that more should have been done by way of diagnosis and treatment" (including "suggest[ing] a number of options that were not pursued"), that question "is a classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) (referring to such a claim as "[a]t most [one of] medical malpractice" appropriately brought in state court). "An accident, although it may produce added anguish, is [also] not on that basis alone to be characterized as wanton infliction of unnecessary pain" that amounts to an Eighth Amendment violation. *Id.* at 105. This component exists to prevent allowing medical malpractice claims to "become a constitutional violation merely because the victim is a prisoner." *Id.* at 106; *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

Whether an official had the subjective mental state required for an Eighth Amendment violation "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]" *Farmer*, 511 U.S. at 842. "[A] factfinder may conclude that a

14

prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* When the evidence suggests, for example, that the official "'must have known' about" the risk, that "evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842–43 (describing such evidence as "showing that a substantial risk . . . was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk'"). And an official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences . . . that he strongly suspected to exist[.]" *Id.* at 843 n.8.

### B.

Plaintiff presents no genuine issue of material fact on whether the MDOC Defendants acted with deliberate indifference. Same with Kakani. The X-ray revealed no cancer in Barrett's lungs. It revealed only COPD—something the record shows Kakani and the MDOC Defendants attentively treated Barrett for from the time Mindlin made that diagnosis until Barrett left GHC.

Even if Mindlin erroneously read the X-rays, Plaintiff did not name him in this suit. And "the right to adequate medical care does not encompass the right to be diagnosed correctly[.]" *Johnson*, 398 F.3d at 874; *see also Jones v. Muskegon County*, 625 F.3d 935, 944–45 (6th Cir. 2010) (finding that the doctor's initial incorrect diagnosis of severe constipation, even "in light of [the prisoner's] substantial weight loss and sharp stomach pain[,]" amounted only to negligence given the prisoner also complained of his "inability to have a bowel movement for several days and other stomach pains, which could have been consistent with [the doctor's] diagnosis"). Even assuming Defendants were aware of facts that allowed Kakani or the MDOC Defendants to infer Mindlin either misdiagnosed Barrett or to infer Barrett faced substantial risk of serious harm other

15

than COPD, *e.g.*, development of lung cancer after the X-ray, Plaintiff puts forth no evidence that Defendants drew those inferences. Nor can she.

Though Barrett continued to complain of symptoms and even once expressed doubt after the diagnosis that he had COPD, Kakani put forth expert evidence at summary judgment that at least some of those post-diagnosis symptoms coincided with those of a COPD patient. Plaintiff fails to rebut this point. She presents no evidence that the post-diagnosis symptoms were those that indicated something other than COPD. So this is not a case where "a factfinder may conclude that [Kakani or the MDOC Defendants] knew of a substantial risk [of lung cancer or serious harm other than COPD] from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Plaintiff's "allegations [instead] amount[] to no more than a difference of opinion concerning [Barrett's] diagnosis and treatment." *Truss-El v. Bradley*, 80 F. App'x 425, 426–27 (6th Cir. 2003) (order) (finding that a nurse's treatment "constituted negligence at most" where she "treated [the inmate's] facial lacerations[] and [] fail[ed] to detect his cracked ribs" despite the inmate's "requests to be taken to the hospital emergency room" after getting beaten up); *see also Tapp v. Banks*, 1 F. App'x 344, 352–53 (6th Cir. 2001) (finding no Eighth Amendment violation where the jail personnel failed to treat the inmate for his fractured patella despite the inmate telling "jail personnel about his pain" because it could not find personnel were deliberately indifferent where, among other factors, the doctor provided an "inaccurate diagnosis" and the "swelling in the [inmate's] knee" "could occur with either" "a bruise or a fracture"). And we have expressed in the past a "reluctan[ce] to second guess medical judgments where a prisoner has received some medical attention and the dispute concerns the adequacy of that treatment." *Broyles*, 478 F. App'x at 976 (quoting *Clark v. Corr. Corp. of Am.*, 98 F. App'x 413, 416 (6th Cir. 2004)).

No. 20-1035, *Barrett v. Carter*

The undisputed facts show Defendants were not deliberately indifferent; Plaintiff has put forth no genuine dispute of material fact on the subjective component of her Eighth Amendment claim. We need not resolve whether she has met that showing for that claim's objective component.

But Plaintiff asserts that three cases from this court allow her to prevail: *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543 (6th Cir. 2009), *Johnson*, 398 F.3d at 868, and *Blackmore v. Kalamazoo*, 390 F.3d 890 (6th Cir. 2004). They do not. All three of those cases involved facts that revealed a risk so obvious that a reasonable jury could find from the obviousness alone that the defendants in fact inferred a substantial risk of serious harm existed. And in all three, despite the obvious risks, the defendants failed to treat the inmates (for at least some period of time). Unlike in those cases, the facts here do not reflect such an obvious risk of serious harm from which a reasonable jury could find Defendants made such an inference. Instead, Defendants (for good reason) did not suspect, much less "strongly suspect[,]" Barrett had anything other than COPD. And they provided Barrett with frequent medical treatment for that condition. Plaintiff's claim amounts to a challenge to the medical judgment exercised by medical professionals, which cannot form the basis of an Eighth Amendment deliberate indifference claim.[14]

---

[14] We note the *Blackmore* panel quoted the Supreme Court for the proposition that a reasonable jury "could conclude [from the facts in that case] that Defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and the Defendants ignored that risk.'" 390 F.3d at 896 (quoting *Farmer*, 511 U.S. at 837). But defendants in Eighth Amendment litigation "must also draw the inference" of a substantial risk of serious harm. *Farmer*, 511 U.S. at 837 ("[T]he official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." (emphasis added)). We infer from the panel's finding ("the Defendants ignored th[e] risk") that the panel concluded a reasonable jury could find the defendants in *Blackmore* did in fact draw the inference and not that an Eighth Amendment claim could move forward even where the record is devoid of any evidence that the defendants drew the inference that serious harm existed.

17

Case 2:18-cv-11212-SJM-EAS ECF No. 55-2, PageID.636 Filed 08/12/20 Page 19 of 19
Case: 20-1035 Document: 55-2 Filed: 08/12/2020 Page: 19 (19 of 19)

No. 20-1035, *Barrett v. Carter*

Thus, Plaintiff cannot overcome Defendants' summary judgment motions. The district court appropriately found that the undisputed facts revealed Kakani did not violate Barrett's Eighth Amendment rights and the MDOC Defendants are entitled to qualified immunity.

## III.

Plaintiff understandably mourns Barrett's death, especially given his untimely passing right after he was paroled. But the record contains no genuine issue of material fact on whether Defendants were deliberately indifferent. So we AFFIRM.

---

Plaintiff also makes much of the language used by the panel in *Dominguez*—that "[a]s a trained medical professional, a registered nurse, [the defendant] was aware *or should have been aware* of" the dangers and risks that "accompany heat-related illnesses and dehydration." 555 F.3d at 550 (emphasis added). But the panel used that language to highlight the *obviousness* of the risks or inferences the defendant could have made from the known facts in that case. *Dominguez* does not water down the subjective component analysis to something less than what the Supreme Court announced—that a defendant was aware of the facts that could give rise to the inference *and* drew the inference that a substantial risk of serious harm exists. *See Farmer*, 511 U.S. at 837–39. And it could not; the Supreme Court has explicitly instructed that "an official's failure to alleviate a significant risk that he should have perceived but did not" cannot amount to an Eighth Amendment violation. *Id.* at 838, 843 n.8.